**TRANS UNION LLC, Appellant**

v.

**FEDERAL TRADE COMMISSION, et al., Appellees,**

No. 01–5202.

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 2002.
Decided July 16, 2002.

---

Ernest Gellhorn argued the cause for the appellant. Roger L. Longtin and Stephen L. Agin were on brief. Mary E. Gately entered an appearance.

John F. Daly, Counsel, Federal Trade Commission, argued the cause for the appellees. Lawrence DeMille–Wagman and Michael D. Bergman, Attorneys, Federal Trade Commission; Jeanette Roach, Counsel, Federal Deposit Insurance Corporation; Alisa B. Klein and Mark B. Stern, Attorneys, United States Department of Justice; Rosa M. Koppel, Attorney, United States Department of Treasury; Thomas J. Segal, Deputy Chief Counsel, and Elizabeth R. Moore, Counsel, Office of Thrift Supervision; and Katherine H. Wheatley, Assistant General Counsel, Board of Governors of Federal Reserve System, were on brief. Richard M. Ashton, Associate General Counsel, Board of Governors of Federal Reserve System; Gregory F. Taylor, Counsel, Federal Deposit Insurance Corporation; and Larry J. Stein, Attorney, United States Department of Treasury, entered appearances.

Bill Lockyer, Attorney General, State of California, and Susan E. Henrichsen, Deputy Attorney General, State of California,

were on brief for the amici curiae in support of the appellees.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Trans Union, LLC, a "credit reporting agency" (CRA) under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681 *et seq.*,[1] challenges regulations promulgated by the Federal Trade Commission (FTC) and other federal agencies[2] to implement the privacy provisions of the Gramm–Leach–Bliley Act (GLBA), Pub.L. No. 106–102, 113 Stat. 1338 (1999) (codified at 15 U.S.C. §§ 6801 *et seq.*). Trans Union contends the regulations unlawfully restrict a CRA's ability to disclose and reuse certain consumer information because (1) a CRA is not a "financial institution" subject to the FTC's rulemaking authority under the GLBA; (2) the regulations' definition of the statutory term "personally identifiable financial information" (PIFI) is overbroad; (3) the regulations' restrictions on reuse of information are inconsistent with the GLBA; and (4) the challenged regulations infringe Trans Union's right of free speech under the First Amendment to the United States Constitution. The district court rejected these challenges and upheld the

**1.** The FCRA defines a CRA as

any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

regulations. For the reasons set out below, we affirm the district court's decision.

## I.

The Congress enacted the GLBA in order "[t]o enhance competition in the financial services industry," Pub.L. No. 106–102, 113 Stat. at 1338, by "eliminat[ing] many Federal and State law barriers to affiliations among banks and securities firms, insurance companies, and other financial service providers," H.R. Conf. Rep. No. 106–434 at 1, 151 (1999), U.S. Code Cong. & Admin. News at 245, 246. Title V of the GLBA contains a number of provisions designed to protect the privacy of "nonpublic personal information" (NPI) that consumers provide to financial institutions, *see* 15 U.S.C. §§ 6801–6809, reflecting "the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information," 15 U.S.C. § 6801(a). The GLBA restricts the ability of a "financial institution" to disclose NPI to a nonaffiliated third party by requiring (subject to certain exceptions not pertinent here) that the financial institution provide the consumer with notice of the institution's disclosure policies and the opportunity for the consumer to "opt out" of disclosure. *Id.* § 6802(a)-(b), (e). The GLBA further mandates that an unaffiliated third party recipient of NPI "shall not,

15 U.S.C. § 1681a(f). The parties agree that Trans Union comes within this definition. *See* Appellant's Br. at 3; Appellees' Br. at 12.

**2.** The other federal agencies sued in this action are the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation and the National Credit Union Administration. This opinion will refer to the appellee agencies, collectively, as the FTC.

directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution." *Id.* § 6802(c).

To implement its disclosure restrictions, the GLBA gives the FTC and other agencies broad rulemaking authority:

(a) Regulatory authority

(1) Rulemaking

The Federal banking agencies, the National Credit Union Administration, the Secretary of the Treasury, the Securities and Exchange Commission, and the Federal Trade Commission shall each prescribe, after consultation as appropriate with representatives of State insurance authorities designated by the National Association of Insurance Commissioners, such regulations as may be necessary to carry out the purposes of this subchapter with respect to the financial institutions subject to their jurisdiction under section 6805 of this title.

15 U.S.C. § 6804(a)(1). Section 6805(a) further provides for enforcement of both the GLBA and the regulations promulgated pursuant thereto "by the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law," as described in section 6805(a). *Id.* § 6805(a). The first six paragraphs of section 6805(a) specify under what authority and by which agencies the GLBA and the regulations are to be enforced against

banks, savings associations, commercial lending companies, credit unions, securities brokers and dealers, investment companies, investment advisers and insurance providers. *See id.* U.S.C. § 6805(a)(1)-(6). The final, catchall paragraph of section 6805(a) mandates enforcement "[u]nder the Federal Trade Commission Act by the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under paragraphs (1) through (6)." *Id.* § 6805(a)(7). CRAs are not among the entities identified in the first six paragraphs.

On May 24, 2000 the FTC published its Final Rule on "Privacy of Consumer Financial Information," 65 Fed.Reg. 33,646, setting forth regulations comparable to and consistent with those promulgated by other federal agencies. *See* 65 Fed.Reg. at 33,646 n.3.[3] On August 30, 2000 Trans Union filed an action in the district court challenging the FTC's regulations on the grounds, *inter alia*, that (1) a CRA is not a "financial institution" subject to the FTC's rulemaking authority under 15 U.S.C. § 6804(a)(1); (2) the FTC overbroadly defined PIFI; (3) the regulations' restrictions on reuse of consumer information are inconsistent with the GLBA; and (4) the regulations violate Trans Union's First Amendment free speech right. In a memorandum opinion and order filed April 30, 2001, the district court rejected all of Trans Union's objections and granted summary judgment in the agencies' favor. *See Individual Reference Serv. Group, Inc. v. FTC*, 145 F.Supp.2d 6 (D.D.C.2001). Trans Union filed a notice of appeal on June 20, 2001 challenging the regulations on the four grounds enumerated above.

---

**3.** We hereafter expressly address only the regulations adopted by the FTC because it is the agency with jurisdiction over CRAs and thus with authority to enforce the GLBA and regulations promulgated thereunder against appellant Trans Union under 15 U.S.C. § 6805(a)(6).

## II.

The court reviews the district court's summary judgment decision *de novo* and "we may affirm only if 'there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law.'" *Gilvin v. Fire,* 259 F.3d 749, 756 (D.C.Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c))). We conclude the FTC is entitled to summary judgment under this standard and therefore affirm the district court. We address each of Trans Union's arguments seriatim.

### A. Authority to Regulate CRAs

■ First, Trans Union asserts the FTC lacks authority to promulgate regulations governing CRAs because a CRA is not a "financial institution" subject to the FTC's regulatory authority under 15 U.S.C. § 6804(a)(1). In reviewing the FTC's interpretation of the GLBA, we use the familiar *Chevron* analysis:

> If ... " 'Congress has directly spoken to the precise question at issue,' " we "must give effect to Congress's 'unambiguously expressed intent.'" *Secretary of Labor v. [Fed. Mine Safety & Health Review Comm'n],* 111 F.3d 913, 917 (D.C.Cir. 1997) (quoting *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). "If 'the statute is silent or ambiguous with respect to the specific issue,' we ask whether the agency's position rests on a 'permissible construction of the statute.'" *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694).

*National Multi Housing Council v. EPA,* 292 F.3d 232, 234 (D.C.Cir.2002) (quoting *Cyprus Emerald Resources Corp. v. Fed. Mine Safety & Health Review Comm'n,* 195 F.3d 42, 45 (D.C.Cir.1999)). To the extent that the statutory term "financial institution" may be ambiguous, we believe the FTC reasonably construed the term to apply to a CRA.

■ Section 6809 of title 15 defines "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." Section 1843(k)(4) of title 12 in turn defines "activities that are financial in nature" to include "[e]ngaging in any activity that the [Federal Reserve] Board has determined, by order or regulation that is in effect on November 12, 1999, to be so closely related to banking or managing or controlling banks as to be a proper incident thereto (subject to the same terms and conditions contained in such order or regulation, unless modified by the Board)." On February 28, 1997, the Federal Reserve Board promulgated a regulation, still "in effect on November 12, 1999," which expressly identifies as among "activities ... so closely related to banking or managing or controlling banks as to be a proper incident thereto" those activities that "are usual in connection with making, acquiring, brokering or servicing loans or other extensions of credit," including:

> Credit bureau services. Maintaining information related to the credit history of consumers and providing the information to a credit grantor who is considering a borrower's application for credit or who has extended credit to the borrower.

Bank Holding Companies and Change in Bank Control (Regulation Y), 62 Fed.Reg. 9290, 9329 (1997) (codified at 12 C.F.R. § 225.28(b)(2)(v)). Because the Federal Reserve Board's regulation characterizes credit bureau services as "so closely related to banking or managing or controlling banks as to be a proper incident thereto," we conclude the FTC permissibly determined that Trans Union, which provides

such services, *see* Appellant's Brief at 3, comes within the GLBA's definition of a "financial institution"[4] and is therefore subject to its rulemaking authority under 15 U.S.C. § 6804(a)(1).

### B. Definition of "Personally Identifiable Financial Information"

Next, Trans Union challenges the FTC's definition of PIFI. Both the GLBA and the regulations define NPI[5] in terms of PIFI. The GLBA does not define PIFI but the FTC regulations define the term to mean

4. Trans Union also contends the FTC is precluded from regulating a CRA's disclosure of consumer report information by virtue of the GLBA's "savings" clause:

   [N]othing in this chapter shall be construed to modify, limit, or supersede the operation of the Fair Credit Reporting Act and no inference shall be drawn on the basis of the provisions of this chapter regarding whether information is transaction or experience information under section 1681a of this title.

   15 U.S.C. § 6806. Trans Union reasons that because the FCRA authorizes a CRA to furnish consumer reports, the FTC may not place restrictions on a CRA's disclosure of credit report information. The FCRA, however, expressly limits a CRA's authority to furnish reports to specific, enumerated types of information, *see* 15 U.S.C. § 1681a(d), and to specific, enumerated "circumstances and no other," 15 U.S.C. § 1681b(a). Thus, the savings clause does not prevent the FTC from restricting a CRA's disclosure either of unenumerated types of information or under unenumerated circumstances.

5. The GLBA defines NPI as

   personally identifiable financial information—
   (i) provided by a consumer to a financial institution;
   (ii) resulting from any transaction with the consumer or any service performed for the consumer; or
   (iii) otherwise obtained by the financial institution.

any information:

   (i) A consumer provides to you [the financial institution] to obtain a financial product or service from you;

   (ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or

   (iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.

16 C.F.R. § 313.3(*o*)(1)(i)-(iii).[6] This broad definition of PIFI "treat[s] any personally

15 U.S.C. § 6809(4)(A). The FTC regulations define NPI as
   (i) Personally identifiable financial information; and
   (ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.
   16 C.F.R. § 313.3(n)(1).

6. The regulation provides the following examples of PIFI:

   (A) Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;

   (B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

   (C) The fact that an individual is or has been one of your customers or has obtained a financial product or service from you;

   (D) Any information about your consumer if it is disclosed in a manner that indicates that the individual is or has been your consumer;

   (E) Any information that a consumer provides to you or that you or your agent otherwise obtain in connection with collecting on, or servicing, a credit account;

   (F) Any information you collect through an Internet "cookie" (an information collecting device from a web server); and

   (G) Information from a consumer report.
   16 C.F.R. 313.3(*o*)(2)(i). The regulation expressly excludes the following from the definition of PIFI:

identifiable information as financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer." 65 Fed. Reg. at 33,658. Trans Union challenges the definition on two grounds, both of which we reject.

■ First, Trans Union asserts the FTC's definition of PIFI is *ultra vires* because the GLBA does not expressly confer authority to define PIFI as it does the term "publicly available information." *See* 15 U.S.C. § 6809(4)(B) (term "nonpublic personal information" "does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title"). We disagree. "Where ... Congress enacts an ambiguous provision within a statute entrusted to the agency's expertise, it has 'implicitly delegated to the agency the power to fill those gaps.'" *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C.Cir.1999) (quoting *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C.Cir.1987); citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782); *see also Women Involved in Farm Economics v. USDA*, 876 F.2d 994, 1000–01 (D.C.Cir. 1989) (noting "the presumptive delegation to agencies of authority to define ambiguous or imprecise terms we apply under the *Chevron* doctrine"), *cert. denied*, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). Thus,

> administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was

promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001). The GLBA is silent on the meaning of PIFI and, as is apparent from the parties' differing positions and from our discussion of the term's meaning *infra*, the term itself is not without ambiguity. Accordingly, we conclude that the FTC is authorized to define PIFI and that its definition is entitled to *Chevron* deference, given the broad rulemaking authority the GLBA confers on the FTC (and the other agencies) to "prescribe ... such regulations as may be necessary to carry out the purposes of [the act] with respect to the financial institutions subject to their jurisdiction under section 6805 of this title." 15 U.S.C. § 6804(a)(1).

■ Trans Union next challenges the FTC's definition of PIFI insofar as it encompasses information appearing in consumer credit report headers, such as name, address, telephone number and social security number, which, Trans Union contends, is not "financial" information and therefore does not come within the GLBA's definition of NPI as "personally identifiable *financial* information." 15 U.S.C. § 6809(4)(A) (emphasis added). Because, as noted above, the GLBA is silent on the meaning of PIFI, we review the FTC's interpretation of the term under

---

(A) A list of names and addresses of customers of an entity that is not a financial institution; and

(B) Information that does not identify a consumer, such as aggregate information or blind data that does not contain personal identifiers such as account numbers, names, or addresses.

16 C.F.R. 313.3(*o*)(2)(ii).

*Chevron* only to determine if it is a permissible one. We conclude that it is.

Trans Union contends the term "financial" in PIFI must be given its "plain meaning" and therefore must be applied only to information that "describes [an individual's] financial condition." Appellant's Br. at 21. We disagree. The dictionary defines "financial" expansively to mean "relating to finance and financiers." Webster's Third New Int'l Dictionary 851 (1993); *see also* V Oxford English Dictionary 921 (2d ed.1989) (defining "financial" as "[o]f, pertaining, or relating to finance or money matters"). Given the breadth of the definition, we cannot conclude the Congress unambiguously intended the restrictive "plain meaning" Trans Union espouses. Similarly, we cannot rule out the FTC's broad interpretation of "financial" to encompass any information that "is requested by a financial institution for the purpose of providing a financial product or service," 65 Fed.Reg. at 33,658, inasmuch as all such information can be fairly characterized as "relating to finance and financiers." The FTC explained that its "approach is consistent with the broad definition of 'financial institution' used in the statute, which encompasses not only traditional financial activities (such as banks, mortgage lenders, finance companies), but also a large number of entities that engage in activities not traditionally considered financial (such as financial career counselors, insurance companies, and data processors)." 65 Fed.Reg. at 33,658. While the FTC could have defined "financial" more narrowly, the meaning it chose is nevertheless a permissible one. Accordingly, under *Chevron*, we defer to the FTC's interpretation.

### C. "Reuse" Regulation

■ Next, Trans Union raises two objections to the "reuse" restrictions set out in 16 C.F.R. § 313.11 which limit the manner in which a third party, such as a CRA, may "use" information it receives from a financial institution, as, for example, in a credit report request. We reject each challenge.

First, Trans Union contends the regulation exceeds the FTC's authority under the GLBA because it prohibits a CRA from using "aggregated information" about consumers, which contains no "personally identifiable" information, while 15 U.S.C. § 6802(c) prohibits a third party from reusing only "nonpublic personal information." We reject this challenge as not yet ripe.

■ "To determine whether a controversy is ripe for judicial review the court must evaluate 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *General Elec. Co. v. EPA,* 290 F.3d 377, 380 (D.C.Cir.2002) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Whether the FTC may lawfully prevent disclosure of aggregated data by CRAs is plainly not yet fit for judicial decision. The FTC (as well as the other agencies) has not determined whether or to what extent aggregation should be considered "use" within the meaning of 16 C.F.R. § 313.11. *See* Appellees' Br. at 44 n.26 ("None of the agencies has taken any enforcement action or issued any formal guidance on such issues."); 5/3/2002 Oral Arg. Tr. at 42 ("[I]t's an open issue at the agencies. I think if you look at the rulemaking record, the statement of basis and purpose, it's quite clear that when the agencies were promulgating the use restriction, aggregation was not even discussed."). Unless and until the FTC determines that use includes aggregation, and at what level, the issue is not fit for the court to consider and Trans Union

suffers no hardship from the court's withholding consideration of the issue.

■ Second, Trans Union contends the reuse regulation improperly prohibits CRAs from reusing account numbers for marketing purposes in violation of section 6802(d) which, Trans Union contends, expressly exempts CRAs from all restrictions on marketing account numbers. We conclude the FTC reasonably construed section 6802(d) otherwise. Section 6802(d) establishes a flat prohibition on disclosure by a financial institution of consumer account numbers with no provision for waiver by the consumer pursuant to the opt-out provisions in section 6802(b): "A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer." 15 U.S.C. § 6802(d). The FTC has interpreted the language "other than to a consumer reporting agency" to create a narrow exception that permits a financial institution to disclose an account number to a CRA only for the specific marketing purposes expressly authorized in section 605(c)(1)(B) of the FCRA, namely "in connection with [a] credit or insurance transaction that is not initiated by the consumer" if "the transaction consists of a firm offer of credit or insurance," 15 U.S.C. § 1681b(c)(1)(B). In other words, the FTC maintains, the Congress inserted the exception into section 6802(d) solely to prevent a conflict between this section and FCRA § 605(c)(1)(B) which authorizes such marketing disclosure. We find the FTC's interpretation is both plausible and consistent with the plain intent of section 6802(d) to more tightly restrict disclosure of account numbers than of other NPI. If the exception were read as broadly as Trans Union advocates—to permit unfettered marketing use of an account number by a CRA—the account number would enjoy less, not more, protection than other NPI because it could be disclosed without any opportunity for the consumer to opt out.

### D. Free Speech

Finally, Trans Union contends the regulations' restrictions on disclosure and reuse violate its First Amendment right of free speech because they prevent Trans Union from disseminating truthful nonpersonal information. To the extent the challenge goes to the reuse of aggregated information, we conclude it is not ripe for the reasons set out *supra*, pp. 51–52. With regard to the other challenged restrictions, we conclude Trans Union's First Amendment arguments are foreclosed by our opinion in *Trans Union Corp. v. FTC* (*Trans Union I*), 245 F.3d 809, reh'g denied, 267 F.3d 1138 (D.C.Cir.2001), cert. denied, —— U.S. ——, 122 S.Ct. 2386, 153 L.Ed.2d 199 (2002).

■ First, Trans Union asserts the regulations do not survive strict scrutiny review. In *Trans Union I*, however, the court expressly held that "information about individual consumers and their credit performance" in Trans Union's marketing lists is not subject to strict scrutiny because it "is solely of interest to the company and its business customers and relates to no matter of public concern." 245 F.3d at 818. The information Trans Union wishes to disclose here likewise implicates no public concern and therefore, as in *Trans Union I*, "warrant[s] 'reduced constitutional protection.'" *Id.* (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 n. 8, 105

S.Ct. 2939, 2947, n. 8, 86 L.Ed.2d 593 (1985)).

Trans Union next argues that even if its contemplated marketing qualifies only as commercial speech, the regulations do not pass constitutional muster for several reasons. Trans Union first contends the regulations do not advance a substantial state interest. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) ("In commercial speech cases, . . . we ask whether the asserted governmental interest is substantial."). This argument as well is precluded by *Trans Union I* which expressly recognized that the governmental interest in "protecting the privacy of consumer credit information" "is substantial." 245 F.3d at 819. Trans Union also contends the FTC did not satisfy its burden of identifying a harm that the regulation alleviates to a material degree. *See Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U.S. 173, 188, 119 S.Ct. 1923, 1932, 144 L.Ed.2d 161 (1999) (under *Central Hudson* test, "governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree") (quoting *Edenfield v. Fane,* 507 U.S. 761, 770–71, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993)). On rehearing in *Trans Union I,* however, the court concluded that "the government cannot promote its interest (protection of personal financial data) except by regulating speech because the speech itself (dissemination of financial data) causes the very harm the government seeks to prevent." *Trans Union v. FTC,* 267 F.3d 1138, 1143 (D.C.Cir. 2001). The same is true here. Finally, Trans Union asserts the regulations are overbroad. *See Edenfield,* 507 U.S. at 767, 113 S.Ct. at 1798 ("laws restricting commercial speech" must "be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny") (citing *Board of Trustees of State University of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989); *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350). As we noted on rehearing in *Trans Union I,* regulations such as these, which "[a]im[ ] directly at [their] intended target," "ha[ve] neither indirect nor unintended effects on speech" and "therefore sweep[ ] only as broadly as necessary to accomplish [their] goal: protecting the privacy of personal financial information." 267 F.3d at 1142–43. Trans Union has not proposed any specific means by which "the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech." *Thompson v. Western States Med. Ctr.,* —— U.S. ——, 122 S.Ct. 1497, 1506, 152 L.Ed.2d 563 (2002). The only alternative Trans Union suggests—allowing CRAs to use a notice and opt-out mechanism as other financial institutions do—is not significantly narrower than the regulations' present restrictions under which a consumer is already provided notice and opportunity to opt out by the financial institution with which he conducts the transaction in the first instance. There is no reason to believe a consumer would be more eager to relinquish his privacy right to a CRA that subsequently obtains his NPI than he was to the financial institution with which he initially dealt.

For the foregoing reasons, the decision of the district court is

*Affirmed.*